Sharkey v. JPMorgan Chase Good morning, Your Honors. Lawrence Pearson of Wigdore LLP for Plaintiff Appellant, Jennifer Sharkey. Your Honors, this is a case in which summary judgment has been granted against the plaintiff on a Sarbanes-Oxley whistleblower retaliation claim. The plaintiff was terminated 24 hours after she had announced her intention to send exit letters about a client who she had recommended severing JPMorgan's relationship with the previous week. That recommendation came after a few months of observing 24 different red flags, which were also acknowledged by JPMorgan's own risk department, which had been disregarded by her supervisor, dismissed as not significant, and in which other evidence of animus also manifested itself leading up to her termination and even after her termination. The district court, Judge Sweet, found here that indeed there was protected activity that Ms. Sharkey had complained about to her supervisor, wire fraud in the form of an escrow account being used by this client, Client A, without any known authorization. Ms. Sharkey's other complaints concerned hallmarks of other species of fraud, wire fraud, mail fraud, bank fraud, and also money laundering. Furthermore, Ms. Sharkey expressly told her supervisor over the weeks and couple of months leading up to her termination that she was very concerned that the bank was not meeting its federal know-your-client customer identification obligations. And this had been a problem that had predated Ms. Sharkey on the account, but she was the one who was pressing this. She was the one who was raising it, and ultimately, the person who did not take the see-no-evil approach. This is mid-2009, in the immediate wake of the financial crisis. Is there a question of fact as to whether the bank decided to terminate Client A? Is there a dispute on that? Well, yes, there is, Judge Chin. In fact, that is one of what we submit is the indicators of animus here, and also, indeed, one of the issues of fact. Ms. Sharkey recommended exit on July 24th. She had a meeting with her supervisors on July 28th. The Risk Department, which put together a memo later that year, well after Ms. Sharkey's termination, said that her supervisor, Ms. Lassiter, who is an individual defendant, appeared to, quote-unquote, support the decision. The reason that it was only an appearance of support is that, indeed, after Ms. Sharkey was terminated, no action was taken. Ms. Lassiter, again a defendant, claimed at deposition, oh, yes, I took steps to exit after Ms. Sharkey was terminated. I mean, I thought this case basically reduced to one in which, at least at this stage of the proceeding, they don't dispute your client having made out a prima facie case, but they say they had a separate and non-discriminatory or non-prohibited reason for terminating, namely she lied to a supervisor about contact with a client. My concern is whether that is in dispute, whether or not she lied to the client. And it is, Your Honor. Not only is the exit in dispute because nothing was done that was contradicted by the client himself and the new associate on the case, that no steps were taken to exit, yes, the proffered termination reason also is in dispute, Judge Radji. And that's because, how is it in dispute? Certainly. The plaintiff herself squarely disputes this incident. It's at page 899 of the appendix. At her deposition, right? Correct. Deposition. She says there was no conversation about this client in which I was told the client claimed I hadn't called them. There's no instance where I said, oh, I had called them and then Leslie, I had, I did not call this client. Denied the lie. Correct. Now, what we don't have in this record is any affidavit or statement by the client, right? Correct. As to whether or not your client, Ms. Sharkey, called her or not. Well, that's right, Your Honor. There is nothing to back up their reason. I would agree with that. And whose burden is that? Well, Your Honor. To basically put in evidence that tilts the balance one way or the other. At trial, Your Honor? I would submit that. No, no, at this stage of the proceeding. I would submit, Your Honor, that the lack of that particular piece of evidence merely contributes to the fact that there is an issue in dispute. Okay. So that's why you think that it can't be decided summarily. You have two people who had the conversation. Well, although, Your Honor, I would say that the issue really has as much to do with the fact that two people had this conversation. No one else was present. Ms. Lassiter, the supervisor, and Ms. Sharkey. Ms. Sharkey completely disputes Ms. Lassiter's account. And you think if the jury would have believed her, that would preclude them from having carried their burden at the second step? Correct, Your Honor. Okay. So what did Lassiter say at her deposition? Ms. Lassiter claimed that Ms. Sharkey had first claimed that, oh, yes, I had called this client back, and then, you know, sometime shortly thereafter said, Ms. Lassiter, Leslie, I'm sorry, you know, I did not actually call this person back. Ms. Sharkey, for her part, on 899, says, I told my supervisor, yes, I'd spoken to this client, that they're claiming. But Lassiter also said that that was the reason that she was terminated, and then after her break came back and said it was the straw that broke the camel's back. Right? Is that a fair description? That's correct as well, Your Honor, Judge Droning. Not only that, but Ms. Sharkey, and this was something that unfortunately was not discussed at oral argument, the oral argument stopped, although Judge Sweet did inquire about it. Ms. Sharkey was not confronted with this reason at her termination. Instead, she was given a vague explanation that there was a, either a loss of confidence or some kind of dishonesty, and not given a chance to rebut this story. And in fact, that has been found significant in cases that are directly on point here, including another case against J.P. Morgan, the Weiss case, decided by this court on which Judge Sweet, coincidentally, was sitting by designation. So, and it was also found significant in the Perez case cited in our papers. The idea that there was no chance given to the employee to rebut this explanation. Can I just ask you another question about that? Is that it was raised that she had failed the Series 7 exam a couple of times. Had she passed it by the time of her termination? I know she passed it on the third occasion, but was that after her termination or before it? A good question, Your Honor. I don't want to guess, but I know that it's one of the cases that was raised after her termination by both Ms. Lassiter and H.R. This had nothing to do with performance. Well, it may not be as red a red herring if she had passed it before she was terminated. Understood, Your Honor. Point taken. So, the fact is that there's no, that this was a contributing factor, the complaints, because the timing was abrupt, as noted by H.R. Temporal proximity is very close. The Manager T. incident that we've been discussing is denied and false. Her performance was good. There was an e-mail from the higher-ups that showed animus in the week before this exit recommendation, because remember, these conversations had been ongoing, and they backed out of the exit. Finally, and I'll sit down, others who had engaged in alleged or confirmed dishonesty were not fired here, making their approach in this case inconsistent and therefore a contributing factor. Have you misrecorded what their dishonesty was about? The other individuals? Yes, Your Honor. There are several citations, deposition testimony about what those other incidents were. And they involved client contact? The only person who had been terminated for alleged dishonesty involved unauthorized trading. Other instances involved workplace relationships and things like that. Because I think if the jury concludes that your client lied about client contact, you're going to have a very difficult time. All right, thank you. Let's hear from your adversary. May it please the Court, I'm Michael Shisell from Arnold & Porter for the appellees, J.P. Morgan Chase, as well as the individual appellees. I think it's right to focus on whether this protected activity, if we deny that there was any protected activity, but assuming that there was, was it a factor in J.P. Morgan's decision to terminate this plaintiff? Judge Sweet looked at that twice on summary judgment, and both times he looked at the record and decided that there was no evidence that it was a factor. And I think it's important to look at that record because it's an undisputed record. First of all, the decision to terminate the plaintiff was made by multiple employees at J.P. Morgan Chase. This is undisputed. It was made by the plaintiff's immediate supervisor, Ms. Lassiter. It was made by Ms. Lassiter's immediate supervisor, Mr. Green. It was made by Mr. Green's immediate supervisor, Mr. Kenney. The folks above Lassiter relied heavily on her assertion that Ms. Sharkey had lied, right? No. I think they relied on Ms. Sharkey, I mean, on Ms. Lassiter for that information. They learned it from her. That's true. And if there is an issue of fact as to whether she lied, why shouldn't there be a trial to resolve that issue? Because the issue of whether she lied is irrelevant. The issue is whether Ms. Lassiter and the others believe she lied. Because this is not a case where was it, you know— The issue of fact here, she says she didn't say what Ms. Lassiter says she said. So Ms. Lassiter couldn't have believed she lied if she never said the words that are now purported to be false. So I think the record on that is important, Judge Radji. Tell me out. Yeah, here's that record, okay? What part did she lie about? First of all, on terms of the evidence of, we'll call it the lying incident, Ms. Lassiter testified— Alleged lying incident. The alleged lying incident. Ms. Lassiter testified in detail about that, and that's in the appendix at page 447. Ms. Lassiter has contemporaneous notes of her conversation with that client, which is in the confidential appendix at page 700. Mr. Grande has contemporary notes of his conversation with Ms. Lassiter. That's at page 705. I don't dispute that you've got a powerful presentation on this, but in the face of her under oath saying she didn't say what they said and memorialized in contemporaneous notes, I still find it hard to say that we're doing anything other than resolving a dispute of fact. Well, here's what the plaintiff said in her deposition. Yes. This is at page 345 of the confidential appendix. Question, I asked her this, so you don't recall Ms. Lassiter telling you that the client representative, we've called Manager T, was unhappy because she was unable to contact you. Is that fair? Her answer, I don't recall at this time that Judge Droney's point, which is, what was said to her when she was being terminated by the HR manager? This is in the confidential appendix at page 748. This is the deposition of Mr. Grande, the HR manager, and he's asked, I believe this is by plaintiff's counsel, and what was said in that meeting? Answer. Jennifer was very emotional. She was crying. She was sort of distracted. She was texting on her personal phone for most of the entire meeting. Actually, she remarked like she didn't know how she was going to tell her dad about this, and here's the important part. And then we talked briefly through this, I don't want to say the client's name on the public record, through the lying client situation and the back and forth. Interestingly, she never denied or questioned the whole alleged lying incident back and forth. That was the issue that Leslie had talked her through. I talked her through that. She agreed with that, and she agreed with it. She didn't push back on the issue. At the brief at page 42, they say, Sharkey disputes through firsthand testimony that she ever admitted or made any untruthful statement to Lassiter. That's just incorrect, then? That's incorrect. She says a lot of things in her deposition, but she says unequivocally she has no recollection of the exchange. That's not the only part of it. At page 343, where she's also talking of the exchange, and this goes over to 344, she says she recalls Ms. Lassiter and Leslie asking me, had I ever spoken to this client? And I said, yes. And I don't recall Leslie saying that I didn't, that the client had never heard from me. So the point is not what the client said. It's what Ms. Sharkey is saying she said, and she's saying I said that I had spoken to the client. Yes, I did. Now, if that's true and the client is either false or mistaken, there's no basis for thinking there was a lie here, is there? If the client, I'm sorry, the question is? She's saying she told Ms. Sharkey that she had spoken to the client. Right, but she's being very vague there. She may have spoken to the client at some point, but we're talking about a specific incident on a specific date when Leslie Lassiter got a call from the client and said, where's Jennifer Sharkey? She's a phantom. I can't get in touch with her. And on that incident, she did not... Could not a jury hearing, a reasonable jury hearing this testimony conclude that she had spoken to the client? But Judge, I think it's irrelevant whether or not she did or she didn't, but what matters is this is a Sarbanes-Oxley case. So if the employer believes that the employee lied, she's an at-will employee, they can terminate her for that on the heels of performance-related problems. I don't disagree with that, but if the purported belief that she lied is contradicted, is not supported by the evidence and, indeed, is contradicted by her testimony, then that's a question for the jury. So what you have to look at is... Did she talk to the client or not? And in pages 343, 344, she said she did. Now, your client says that the...or Ms. Sharkey says that the Chase client, J.P. Morgan Chase client, said no, they didn't. But that we don't have any evidence on. We don't have any evidence from the client saying, indeed, Ms. Sharkey didn't call me or didn't answer my calls, or yes, that's exactly what I told Ms. Sharkey. So we have the two participants in the conversation giving different accounts. Right, but at the end of the day, we cited these cases that say courts are not going to be super-H.R. departments in situations like this. All that matters is that we believe that there was a lie and that there's no proof that any... Is there a question of fact as to what Chase actually believed? No. There's no question, in fact, of what Chase believed. They believed that she had lied to them. Where's the basis for that? It's the testimony of their employees as to their belief. Right, and if it's disbelieved, if it's disbelieved because they haven't put anything from the client, they believed it based on what they say the client told them. There's no evidence from the client as to what it told Chase. And they believe it based on Ms. Sharkey's response when they terminated her as well and when Ms. Lassiter approached her. She didn't deny it. I'm not sure that those pages will support that. But do you... Can I just ask you about the sequence, too? It seems to be a big deal for the plaintiff's presentation that she suggests that she said that Client A should be terminated at the time she was terminated. It raises a question about whether that was the real reason that she was terminated, that this was an important client with some questionable dealings, and she raised it. And then shortly after, she's fired. Is that the wrong sequence of events? It's the wrong sequence of events. What's the sequence, then? Because the plaintiff is speaking out of both sides of her mouth on this issue. On the one hand, the plaintiff argues that J.P. Morgan terminated her within two weeks of sending this July 24, 2009, email. On the other hand, the plaintiff testified at her deposition, and this is in the appendix 892 to 893, and the plaintiff's repeated in their opening brief at page 12, that she had been blowing the whistle for months before she was terminated. It's crystal clear that that's the position they're taking. Now, in the meantime, during those months, she was having a performance . . . She was raising questionable dealings, but when did she say, I think you've got to get rid of this Client A? This is just trouble. First of all, she never said that. You have to look at the July 24, 2009, email, which is in the appendix at 674. What she says is two things. She says, I feel uncomfortable about this client, and the second thing she says is, I think that the private wealth management business should separate from this client, and we should be sensitive because other lines of business at J.P. Morgan may want to continue doing business with them. If she really believed that there was a crime or a fraud at foot, would she really be saying, well, I don't want to do business with them, but these other departments at J.P. Morgan can? That's absolutely implausible. If you want to think about whether she really reasonably believed that a crime was being committed, she wouldn't be making that recommendation. At the end of the day, Your Honor, the decision makers on terminating Ms. Sharkey, they were all deposed. Every one of them said, in those deliberations, there was never a discussion about Client A. There was never a discussion about any supposed whistleblowing activity. The only thing that they, and that's unrebutted, the only thing that was discussed was the fact that she had a history of various performance problems, and at the end of the day, she ends up lying to her immediate supervisor, which is grounds for termination. There's not a single piece of evidence, nothing, that says, in those deliberations, and they took the depositions, that this Client A was ever discussed. In fact, three of those decision makers, there's not a shred of evidence that they'd ever even heard of these claims about Client A at the time they decided to terminate her. And that's the end of this case. That fact has never changed from day one. They've been litigating it for six years. They lost in front of OSHA. They lost twice in summary judgment in front of Judge Sweet. And frankly, it's time to put an end to this case, Your Honor. I see my time is up. Unless you have some more questions, I will rest on the papers. Thank you. Your Honor, with respect to the other employees who engaged in dishonesty and yet were not fired, I would refer the Court to Appendix Page 1168, also pages 927 and 982. And indeed, Your Honor, Plaintiff herself was able to give one very specific example in which a co-worker did, in fact, lie to Ms. Sharkey and other team members, stating that collateral had been received prior to the extension of a letter of credit. There was also another I don't think that's analogous at all. As I cautioned you, we're going to have to decide if there's a question of fact here. But if your client lied about contact with a client, who, after all, she's representing, she thinks, may be involved in, according to your presentation, illegal activity, I don't think there's a jury on earth that's not going to find that they had grounds to fire her. So, you know, the question is, as counsel says, this case has been lost at many levels. Do you have a good faith basis to think that when the client is questioned about this, that this is going to come out your client's way? Yes. Not enough, though, to have deposed the client to have it testify as to whether or not your client spoke with them or not, or whether they ever complained about her failure to contact them or anything like that, right? We did depose the primary client at issue, Your Honor. Understood that, obviously, one always goes back and says, we could have taken one more deposition. But the square issue here is that conversation between Ms. Sharkey and Ms. Lassiter. What is the evidence to contradict the defendant's assertion that they believe she was lying? Yes. For that point, Judge Shin, I would refer to a point that was made by a member of the panel earlier, which is that Ms. Lassiter is the one telling the story. To the extent that she's massaging this conversation with Ms. Sharkey, she can't believe her own story. And the fact is that it is fruit of the poison tree. If animus or retaliatory conduct is where the falsity of this reason appeared at a stage of this decision, it infects the entire decision-making process. And there are various cases cited in the papers on that. I'm not sure I follow that. Is there any evidence that Ms. Sharkey hadn't spoken to the client? Apart from Ms. Lassiter's assertions, Your Honor, I— Ms. Lassiter. Is there any evidence that Ms. Lassiter hadn't spoken to the client and received the complaint she reported receiving? Apart from Ms. Sharkey's testimony, I'm not sure that there's anything else apart from testimony of the client herself that that could be. Right. So the answer is no. There's no evidence to that effect. You're relying solely on the fact that your client will be believed and Ms. Lassiter won't. Well, Your Honor, the fact is that the—it does present a square issue of fact that can't be accepted as undisputed. Ms. Sharkey unequivocally denied this. The court pointed it out at 343, also at 344, and at 899. The client unequivocally says, no, this is what I told my supervisor. I did not say one thing and then backtrack. That did not happen. All right. Thank you very much. Thank you, Your Honor. We're going to take the case under advice.